IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GEORGE E. ROBINSON,

        Plaintiff,                        No. CIV S-06-2453 GGH

    vs.

MICHAEL J. ASTRUE,               <u>ORDER</u>
Commissioner of
Social Security,

        Defendant.

_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment is GRANTED in part, the Commissioner's Cross Motion for Summary Judgment is DENIED in part, the Clerk is directed to enter judgment for the plaintiff, and this matter is remanded to the Commissioner for further development of the record.

BACKGROUND

        Plaintiff, born August 29, 1966, applied for disability benefits on June 24, 2004. (Tr. at 49, 219.) Plaintiff alleged he was unable to work since August 25, 2003, due to knee and

1

right upper thigh pain. (Tr. at 49, 61, 219, 102.) In a decision dated May 24, 2005, ALJ L. Kalei Fong determined that plaintiff was not disabled.[1] The ALJ made the following findings:

> 1. The claimant met the insured status requirements of the Social Security Act only through December 31, 2005.
>
> 2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).
>
> 3. The claimant has the following severe impairments: patellofemoral syndrome,[2] status post right lateral retinacular release, grade III chondral lesion of the medial femoral condyle, and a mood disorder (20 CFR 404.1520(c) and 416.920(c)).

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:
>   Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>   Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>   Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>   Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>   Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

[2] Patellofemoral syndrome, aka chondromalcia patella, results from degeneration of cartilege due to poor alignment of the kneecap. www.medicinenet.com. Lateral retinacular release detaches the patella from lateral soft tissue structure. Wheeless Textbook of Orthopaedics, www.wheelessonline.com.

| | | |
|---|---|---|
| | 4. | The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). |
| | 5. | After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift/carry 20 pounds occasionally and ten pounds frequently, stand/walk two of eight hours, sit for six of eight hours, occasionally perform postural activities except no climbing ladder/ropes/scaffolds, crawling, squatting, or concentrated exposure to extreme cold or heat. In addition, he can do simple, repetitive tasks with limited public contact of a low stress nature consistent with unskilled work. |
| | 6. | The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965). |
| | 7. | The claimant was born on August 29, 1966 and was 37 years old on the alleged disability onset date, which is defined as a younger individual 18-44 (20 CFR 404.1563 and 416.963). |
| | 8. | The claimant has at least a high school education (GED) and is able to communicate in English (20 CFR 404.1564 and 416.964). |
| | 9. | Transferability of job skills is not an issue in this case because of the claimant's age and residual functional capacity (20 CFR 404.1568 and 416.968). |
| | 10. | Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966). |
| | 11. | The claimant has not been under a "disability," as defined in the Social Security Act, from August 25, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)). |

(Tr. at 16-21.)

ISSUES PRESENTED

Plaintiff has raised the following issues: (A) Whether the ALJ Failed to Provide Clear and Convincing Reasons for Rejecting the Opinion of Plaintiff's Treating Physician; (B)

3

Whether the ALJ Erred in Failing to Sustain His Burden of Establishing That There is Other Work in the National Economy That Plaintiff Can Perform; and (C) Whether the ALJ's Credibility Findings are not Supported by Substantial Evidence.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

A.  Rejection of Treating Physician's Opinion

Plaintiff claims that the ALJ erred in rejecting the treating opinion of Dr. Nguyen, an internist.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[3] Ordinarily,

---

[3] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered

4

more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester , 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[4] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

In this case, the ALJ noted Dr. Nguyen's opinion that plaintiff was restricted to standing and walking for five minutes per hour, sitting for 30 to 60 minutes per hour and lifting

---

"other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

[4] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

and carrying 20 pounds only. Dr. Nguyen also precluded plaintiff from bending, squatting, kneeling, and climbing. He recommended a cane for ambulation. (Tr. at 209.) This opinion, dated November 18, 2004, was based on plaintiff's permanent condition. The ALJ rejected the opinion because Kaiser treating records indicated plaintiff's right knee was "well healed with no effusion or evidence of infection, range of motion of 1-130 degrees, no joint line tenderness, ligament instability, crepitus or apprehension." (Tr. at 20.) The records also showed that no further surgery was recommended. The ALJ also rejected the opinion in part because Dr. Nguyen did not indicate how much plaintiff could sit, stand or walk during the course of a day, and his statements in this regard were vague and inconsistent with the majority of medical evidence. (Id.)

Dr. Nguyen's functional restrictions did contradict the opinions of the SSA doctor and Dr. Schaefer, upon which the ALJ relied. The state agency physician on October 25, 2004, opined that plaintiff could lift and carry 20 pounds occasionally, lift and carry 10 pounds frequently, stand or walk at least two hours in an eight hour day, sit for six hours in an eight hour day, could do limited pushing and pulling with the lower extremities, could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps, stairs, and occasionally balance, stoop, kneel, crouch and crawl. He was to avoid concentrated exposure to extreme cold and heat. (Tr. at 178-81.) Although this doctor did not preclude plaintiff from crawling or squatting, the ALJ did impose limitations on these activities, based on plaintiff's history of knee surgery. (Id. at 19.)

The ALJ additionally relied on Dr. Schaefer, plaintiff's treating orthopedic surgeon, who opined on September 11, 2003, that plaintiff could do only intermittent walking and standing, no climbing, squatting, kneeling, and was restricted to lifting 20 pounds. (Tr. at 138.) This opinion was based on plaintiff's permanent and stationary condition and diagnoses of right patellofemoral pain syndrome, status post lateral retinacular release, and grade III chondromalacia of the medial femoral condyle, status post chondroplasty. (Id.) Dr. Schaefer's recommendation for future care was to have the right knee re-evaluated for increase in pain or

swelling, and possibly anti-inflammatory medications, cortisone injections, or brief periods of physical therapy. (Id.)  On April 6, 2004, Dr. Schaefer noted only mild swelling of plaintiff's right knee, tenderness on pressure to patella, no ligament laxity, no erythema or warmth, and knee x-rays showing only minimal arthritic changes. (Id. at 155, 19.)

The ALJ noted that one week after this opinion, Dr. Schaefer contradicted himself by finding that plaintiff could carry ten pounds.  The ALJ appears to have mistaken Dr. Myint's opinion for Dr. Schaefer's, however.  Dr. Myint, another treating physician, found on September 19, 2003, that plaintiff could do modified work with the following limitations: stand/walk for 1/4 hour at a time for a total of 1 to 2 hours per day, lift and carry up to ten pounds at a time for a total of eight hours a day, no squatting or climbing.  (Tr. at 136.)  This opinion was based on objective findings of: "normal posture and gait.  No apparent knee swelling, effusion noted.  Diffuse TTP (+) peripatellar area.  (-) PF grind test.  knee ROM 0-100 deg. no laxity with varus/valgus stress test. (-) drawer sign.  Normal Rt quad strength." (Id. at 135.)  Diagnosis was status post right knee lateral retinacular release. (Id.)  The ALJ did not credit Dr. Myint's report, thinking it was a change in Dr. Schaefer's opinion, given one week after his opinion that plaintiff could lift 20 pounds, with no objective findings to support this change. (Id. at 19.)  The ALJ found that even if plaintiff were limited to lifting ten pounds, he could still do sedentary work. (Id.)

The ALJ also refers to the opinion of the Worker's Compensation Board, noting that the standards supporting its decision were different than those which apply to Social Security law, but nonetheless finding that this opinion was consistent with the State Agency physician in finding that plaintiff could do intermittent standing and walking, but no climbing, squatting, kneeling or lifting over 20 pounds. (Id. at 19-20.)

Lester does not precisely apply to the situation here in that there are several treating physicians, and Lester addressed a situation where there was only one treating versus other types of physician (examining and non-examining).  There are no precise rules to follow

7

when the opinions of treating physicians conflict.  Nevertheless, under any analysis, the ALJ's reasons are not legitimate.  First, the ALJ's asserted reason that this physician's limitations were vague and did not specify how much plaintiff could sit, stand or walk during a work day, is not logical.  The form completed by Dr. Nguyen, however, asks for the number of minutes per hour plaintiff can do these functions, "based on an 8-hour day."  (Tr. at 209.)  Dr. Nguyen calculated the number of minutes per hour that plaintiff could do each activity.[5]  The fact that Dr. Nguyen did not go one step further and do the math to fill in the total number of hours per day that plaintiff could do these activities is not important as that amount can be calculated by taking the number of minutes per hour and multiplying by eight.  It is disingenuous for the ALJ to reject the opinion on this basis.  The ALJ also rejects it because Dr. Nguyen did not support his opinion with objective clinical signs or findings.  This reason is also suspect.  The form is one page in length and does not call for or provide space for rendering objective findings.  (Id.)  Dr. Nguyen gave plenty of objective findings in his other treatment records.  On May 13, 2004, Dr. Nguyen wrote, "patella femoral vs. patella subluxation," ordered a lower leg immobilizer, and referred plaintiff to orthopedics.  (Tr. at 153.)  On February 12, 2004, he noted right knee effusion and diagnosed plaintiff with chronic right knee pain.  (Tr. at 158.)

Furthermore, the ALJ made the mistake of rejecting a second treating opinion, Dr. Myint, without providing reasons, thinking it was Dr. Schaefer's opinion.  Also, the ALJ noted that no further surgery was recommended; however, he failed to explain the legitimate reason for this recommendation.  Dr. Nagy, a treating orthopedist, had explained that plaintiff was not likely to benefit from surgery, and warned that he could in fact worsen with any type of surgery.  (Id. at 164.)  Dr. Nagy noted on May 24, 2004, after the April, 2003 surgery, that plaintiff's right knee was well healed with no effusion or evidence of infection.  Range of motion was 0-130.  There

---

[5] What is ironic here is that the ALJ chose to rely on Dr. Schaefer's opinion that plaintiff could stand and walk on an intermittent basis which is a vague description of no set time period, unlike Dr. Nguyen's limitation which specifies the number of minutes plaintiff can stand and walk.

was no joint line tenderness, ligament instability or effusion. Patelloremoral joint was without crepitus or apprehension. There was significant right quad deconditioning. Plaintiff was diagnosed with patellofemoral syndrome, and advised to return to strengthening exercises and avoid narcotics. (Tr. at 151.)

Accordingly, because the ALJ's reasons for rejecting this treating physician's opinion are not legitimate, the ALJ must credit the opinion of Dr. Nguyen. Hammock v. Bowen, 879 F.2d 498, 502 (9th Cir. 1989). The ALJ must also credit Dr. Myint's opinion, which limits plaintiff to standing and walking for 1/4 hour at a time for a total of one to two hours per day. (Tr. at 136.) If plaintiff can only stand and walk for one hour a day, and can only do this activity for at most 15 minutes per hour, his ability to do sedentary work is affected. See SSR 96-9p (standing and walking are required "occasionally," totally no more than two hours of an eight hour day). In sum, there is no substantial evidence that plaintiff can stand and walk two hours a day, and the ALJ's reliance on Dr. Schaefer's report (finding plaintiff can do "intermittent" standing and walking)[6] for this assessment was error. The term, "intermittent" does not equate to two hours in an eight hour work day. When Dr. Schaefer's report drops out, all that is left is the non-examining report of the SSA doctor, who is the only medical source specifically finding plaintiff can stand and walk for two hours. This report by itself does not constitute substantial evidence as no treating source provided this limitation.

Therefore, the case will be remanded for the ALJ's reassessment of plaintiff's treating physicians and other evidence, and for a substantially supported basis of how long plaintiff can stand and walk in an eight hour day. Once the extent of this limitation is

---

[6] Plaintiff makes the additional argument that Dr. Schaefer's limitation of "intermittent" standing and walking would not permit plaintiff to stand and walk for two hours a day required by sedentary work which is unskilled and "particularly structured so that a person cannot ordinarily sit or stand at will," citing SSR 83-12, *4. That ruling, however, addresses the problem of needing to stand and walk as an alternate to sitting. The ruling warns that the need to alternate is not compatible with sedentary work which requires prolonged sitting. Id. That problem is not present in this case where plaintiff can sit for the entire day if necessary.

9

determined, the ALJ must obtain vocational testimony which includes this limitation in any hypothetical as the full range of sedentary work requires the ability to stand and walk for up to two hours, and clearly plaintiff cannot meet this standard. See discussion Section B.

B. Whether the ALJ Should Have Used the Testimony of a Vocational Expert in Determining Plaintiff's Residual Functional Capacity

Plaintiff contends that the ALJ should have utilized a vocational expert due to his significant nonexertional limitations.

The Guidelines in table form ("grids") are combinations of residual functional capacity, age, education, and work experience. At the fifth step of the sequential analysis, the grids determine if other work is available. See generally Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

The grids may be used if a claimant has both exertional and nonexertional limitations, so long as the nonexertional limitations do not significantly impact the exertional capabilities.[7] Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other grounds, Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc). The ALJ, however, is not automatically required to deviate from the grids whenever plaintiff has alleged a nonexertional limitation. Desrosiers, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids."); 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2) (1996). The ALJ must weigh the evidence with respect to work experience, education, and psychological and physical impairments to determine whether a nonexertional

---

[7] Exertional capabilities are the "primary strength activities" of sitting, standing, walking, lifting, carrying, pushing, or pulling. 20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary; Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989). Non-exertional activities include mental, sensory, postural, manipulative and environmental matters which do not directly affect the primary strength activities. 20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper, 880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)). "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have nonexertional (not strength-related) limitations that are not covered by the grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

limitation significantly limits plaintiff's ability to work in a certain category. Desrosiers 846 F.2d at 578 (Pregerson, J., concurring). "A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines. In such a case, the guidelines would be inapplicable." Desrosiers, 846 F.2d at 577-78. The ALJ is then required to use a vocational expert. Aukland v. Massanari, 257 F. 3d. 1033 (9th Cir. 2001).

In this case, the ALJ concluded that plaintiff was not disabled at step five of the analysis because although he could not do his past work as a driver for a cabinet shop, he could do unskilled sedentary work with postural restrictions of no climbing ladder/ropes/scaffolds, crawling, or squatting. Additional limitations were no concentrated exposure to extreme cold or heat, and "simple repetitive tasks with limited public contact of a low stress nature consistent with unskilled work." (Tr. at 17.) The ALJ found that these additional limitations had "little or no effect on the occupational base of unskilled sedentary work." (Id. at 21.) The ALJ explained that most sedentary jobs do not require postural activities of the type from which plaintiff is restricted and do not include concentrated exposure to extreme temperatures. She noted that there were about 900 types of jobs which each represent numerous jobs in the national economy which require only a short demonstration or can be performed within 30 days. Therefore, using the guidelines as a framework, the ALJ found plaintiff not disabled. (Id.)

Plaintiff contends a vocational expert should be consulted based on plaintiff's mood disorder which is a severe impairment, plaintiff's limitation to simple and repetitive tasks, and his need for a cane.

1. Mood Disorder

In regard to diagnosed mood disorder, the fact that the ALJ found plaintiff to have severe mental impairments at step two does not equate to a finding that plaintiff is somehow limited at step five. "The step two and step five determinations require different levels of severity of limitations such that the satisfaction of the requirements at step two does not automatically lead to the conclusion that the claimant has satisfied the requirements at step five."

11

Hoopai v. Astrue, 499 F.3d 1071, 1076 (9th Cir. 2007). Hoopai involved severe impairments of depression and back pain. Plaintiff had argued that since the depression was found to be severe at step two, it must automatically be a significant non-exertional limitation at step five such that vocational testimony was required. The court responded that at step five, vocational testimony is only required where non-exertional limitation is "sufficiently severe" to limit a range of work. Id., citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988). Since a step two finding of severity is only a threshold determination of whether someone can do his or her past work, a finding at this step merely raises a prima facie case of a disability. Id. In contrast, a step five determination presumes a step two threshold finding, but requires much more in terms of significance. The court reasoned:

> Clearly, the severity of the limitations at step five that would require use of a vocational expert must be greater than the severity of impairments determined at step two, otherwise the two steps would collapse and a vocational expert would be required in every case in which a step-two determination of severity is made. This would defeat the purpose of the grids because a claimant could not reach the step five determination without making out a prima facie case of a severe disability at step two.

Id. at 1076, citing Heckler v. Campbell, 461 U.S. 458, 461 (1983). After reviewing the evidence, the court determined that vocational testimony was not required because the psychiatrists opined that plaintiff's depression was not sufficiently severe to affect his ability to work beyond the exertional limitations. Id.

The rule of Hoopai would ordinarily apply to this case such that plaintiff's step two finding of mood disorder does not automatically require specific limitations in a hypothetical. Dr. Finkel, although diagnosing plaintiff with mood disorder, found that he could follow simple instructions, and follow through on simple tasks without direct supervision. His interactions with others would be moderately impaired due to chronic pain and depression. Attention and concentration were normal. Pace was mildly to moderately impaired. Plaintiff's ability to work an eight hour day and attend to a regular work schedule were thought to be

moderately to markedly impaired. (Tr. at 215.) Plaintiff's ability to interact with the public, supervisors, and coworkers was moderately impaired. His ability to respond appropriately to work pressures was moderately to markedly impaired. (Id. at 217.) These specific functional limitations go beyond a step two impairment, however, and have some impact on plaintiff's ability to work. The ALJ addressed these limitations by restricting plaintiff to unskilled work involving simple, repetitive tasks and limited public contact. (Id. at 17.) Although the severe impairment of mood disorder by itself does not implicate the step five analysis, the ALJ followed Dr. Finkel's recommended limitations resulting from this disorder. In so doing, he should have considered their effects on the unskilled sedentary base, and that a vocational expert would be required. The court finds that these limitations, along with the need for a cane, substantially erode the occupational base of unskilled sedentary work.

### 2. Limitation to Simple and Repetitive Tasks

Plaintiff also contends that he cannot perform detailed tasks and therefore he can do only a subset of unskilled work which has a reasoning level of 1, eliminating many of the jobs the ALJ presumed he could do. In this case, the ALJ specifically found that plaintiff's limitations had little or no effect on the occupational base of unskilled sedentary work. She noted 900 jobs, each of which represented numerous jobs in the national economy, which plaintiff could do either with a short demonstration or within 30 days. (Tr. at 21.) Desrosiers requires a finding of whether non-exertional limitations significantly limit the range of work plaintiff could otherwise do. Desrosiers, 846 F.2d at 577. The ALJ gave no evidentiary basis for his finding that there were 900 jobs plaintiff could do. The ALJ refers to Rule 201.28 of the grids; however, Rule 201 states that only about 200 separate unskilled sedentary jobs can be identified, each of which represents numerous jobs in the national economy. 20 C.F.R., Pt. 404, Subpt. P, App.2, Rule 210.00 ("maximum sustained work capability limited to sedentary work as a result of severe medically determinable impairment(s)"). This rule does not even take into account the non-exertional impairments acknowledged by the ALJ. Further, the ALJ refers to plaintiff's specific

13

vocational profile ("SVP"); however, SVP levels should not be confused with reasoning levels as these are two separate vocational considerations. SVP levels do not address whether a job involves only simple or less than complex tasks. Meissl v. Barnhart, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005).

Here, the limitation to simple and less than complex tasks must be reconciled with the various reasoning levels of the jobs assigned by a vocational expert. Rather than adhere to a strict construction of what this limitation equates to in terms of reasoning level, this court prefers to follow the well developed reasoning of the Central District in Meissl. There, the plaintiff was found to be limited to "simple tasks performed at a routine or repetitive pace." Id. at 982. The court explained that although the Social Security Regulations contained only two categories of abilities in regard to understanding and remembering instructions, either "short and simple" and "detailed" or "complex,' the DOT had many more gradations for measuring this ability, and there were six gradations altogether. Id. at 984. For example, level 2 requires application of "commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DICOT, App. C. The court continued:

> To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Meissl, 403 F. Supp.2d at 984.

Furthermore, the use of the term "uninvolved" along with the term "detailed" in the DOT qualifies it and refutes any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term. Id. The court found that the plaintiff's RFC must be compared with the DOT's reasoning scale. A reasoning level of one requires slightly less than simple tasks that are in some sense repetitive. For example, they include the job of

14

counting cows as they come off a truck.  A reasoning level of two would encompass an RFC of being able to do "simple and routine work tasks."[8]  Id.

In regard to the restriction of limited public contact, plaintiff aptly points out that potentially large numbers of jobs are precluded by this limitation.  Public contact may be required at any level of complexity, and is a common feature among sedentary jobs.  SSR 83-14; DOT #s 237.367-014, 205.367-014, 209.567-014, 379.367.010.  Pl.'s Reply, Exs. A-D.

It is readily apparent from these questions that a vocational expert is necessary to determine erosion of the occupational base for sedentary work, and specifically what jobs plaintiff can do with his limitation to "simple, repetitive tasks with limited public contact of a low stress nature consistent with unskilled work." (Tr. at 17.)

### 3. Need for a Cane

Plaintiff contends that vocational testimony should have been obtained due to his need to ambulate with a cane.

SSR 96-9p provides in part:

> Medically required hand-held assistive device: To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

The medical evidence establishes that Dr. Schaefer advised plaintiff to use a knee brace and cane as needed.  (Tr. at 138.)  On April 6, 2004, plaintiff was given a cane after he complained that his knee was giving out, resulting in multiple falls.  (Tr. at 154-55.)  On various

---

[8] Plaintiff refers to the jobs of cashier II and motel housekeeper which have a reasoning level of 3; however, these jobs are light, not sedentary, work. Pl.'s Mot., Exs. B, C.

medical visits, it was noted that plaintiff ambulated with a cane. (Id. at 153, 213.) Dr. Nguyen, whose reported was credited previously in this decision, noted that a cane was required with ambulation. (Id. at 209.)

Although the circumstances under which this cane must be used were not described, it is clear the cane is a necessity and its use was not limited. Therefore, on remand the ALJ must insert this limitation into the hypothetical to the vocational expert.

The cumulative effect of the aforementioned limitations are significant and warrant a departure from the grids. See Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573, 580 (9th Cir. 1988) (holding that to extent that a plaintiff can only do *some* of the range of work, the ALJ must use a vocational expert) (emphasis added). *Cf.* Talbot v. Heckler, 814 F.2d 1456, 1462, n.3(10th Cir. 1987) (finding that plaintiff need not be able to perform all jobs within a particular range of work, but must be able to do a substantial majority of them).

The ALJ's use of the Guidelines was not proper in this case, and remand is necessary to obtain vocational testimony.

C.  The ALJ's Credibility Findings Are Supported by Substantial Evidence

Plaintiff next asserts that the ALJ failed to properly evaluate plaintiff's subjective complaints of pain and depression.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible

solely because objective medical evidence does not quantify them. Id. at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[9] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

Here, the ALJ reviewed all the reasons he thought plaintiff's complaints of pain were not entirely credible. First, he noted plaintiff's level of activities which include caring for personal needs, carrying light grocery bags twice a month, driving a car one to three hours, and hunting with friends. (Tr. at 18.) He then noted the medical evidence which revealed a lack of

\\\\\
\\\\\

---

[9] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

significant atrophy,[10] no neurological deficits, no radicular pain, weakness, and no absence of reflex. (Id.) Plaintiff's alleged pain was out of proportion to the clinical findings. The ALJ also commented that plaintiff did not receive treatment for pain despite the alleged severity, but instead used marijuana. He added that side effects from the type of medication used to treat plaintiff's impairments would not preclude him from doing sedentary work. Additionally, the ALJ found both the testimony of plaintiff's fiancee and the statements of other lay witnesses credible but they did not support an inability to perform sedentary work. (Id.) He referenced a note by a medical source to possible drug seeking behavior, and that plaintiff was taking marijuana and Vicodin.[11] (Id. at 19, 174.)

These other references in the record tend to refute plaintiff's own statements in support of his disability claim. An ALJ may disregard a claimant's self-serving statements if they are not supported by the objective evidence. Hudson v. Bowen, 849 F.2d 433, 434 (9th Cir. 1988). The ALJ is accorded great weight in his determination of credibility. Id. See also Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir. 1988). Furthermore, this court gives deference to the ALJ's assessment of plaintiff's demeanor at hearing, and he opined that plaintiff did not appear to be under significant pain or discomfort at that time. The ALJ acknowledged that the hearing was not a conclusive factor but warranted some slight weight. (Tr. at 18.) "Credibility determinations are the province of the ALJ."

---

[10] Plaintiff argues that the ALJ's statement of no significant atrophy is incorrect. It is true that atrophy was noted by Drs. Nagy and Schaefer; however, as Dr. Schaefer pointed out, plaintiff was to continue therapy, home exercises, and anti-inflammatory medication, none of which plaintiff pursued. (Tr. at 188.) The last record of physical therapy visits was September 9, 2003. (Id. at 197-98.) As of May 26, 2005, plaintiff was taking no medication other than prescription marijuana, and was not receiving any other treatment for his knee. (Id. at 210-11, 249.) It is true that plaintiff may not be faulted for inability to afford treatment; however, plaintiff has no excuse for failing to reverse any atrophy by not doing prescribed home exercises. Plaintiff was represented by counsel at the hearing who failed to elicit any testimony that plaintiff did the recommended exercises at home.

[11] The record contains no further medical treatment (other than the belated psychological consultation from Dr. Finkel on January 5, 2006), after plaintiff received a prescription for marijuana on May 26, 2005. (Tr. at 211.)

Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir.1995). In this regard, questions of credibility and resolutions of conflicts in the testimony are functions solely of the [Commissioner]. See Yuckert v. Bowen, 841 F.2d 303, 307 (9th Cir. 1988); Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982)." Morgan v. Apfel, 169 F. 3d at 599. The undersigned need not make any final assessment regarding the ALJ credibility determination because the case is being remanded for other reasons. Rethinking the opinions of treating physicians may cause the ALJ to rethink the credibility analysis as well as the facts regarding treatment play some role in the credibility analysis. This matter is left to the ALJ's discretion on remand.

CONCLUSION

If additional administrative proceedings would remedy the defects in the decision, remand is appropriate. Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); Barbato v. Commissioner of Social Security Admin., 923 F. Supp. 1273, 1277-78 (C.D.Cal. 1996). The court concludes, as did Barbato, that this case should be remanded for further administrative proceedings to enable the ALJ to obtain a more complete record, and to avoid the possibility of an inequitable result.

Accordingly, plaintiff's Motion for Summary Judgment is GRANTED in part, the Commissioner's Cross Motion for Summary Judgment is DENIED in part. This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. §405(g) for further findings in accordance with this order. The Clerk shall enter judgment for plaintiff.

DATED: 03/06/08

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Robinson2453.ss.wpd